UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| HESIQUIO RODRIGUEZ, on behalf of herself and all others similarly situated, | Case No.: 3:22-cv-2899 |
| **Plaintiff,** | |
| v. | |
| CHRISTUS HEALTH and CHRISTUS SPOHN HEALTH SYSTEM CORPORATION, | |
| **Defendants.** | |

## CLASS ACTION COMPLAINT

Plaintiff Hesiquio Rodriguez ("Plaintiff") brings this Class Action Complaint against Christus Health ("Christus Health") and Christus Spohn Health System Corporation ("Christus Spohn") (collectively, "Defendants"), individually and on behalf of all others similarly situated ("Class Members"), and alleges, upon personal knowledge as to his own actions and his counsel's investigations, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this class action against Defendants for their failure to properly secure and safeguard personally identifiable information including, but not limited to, Plaintiff's and Class Members' names, addresses, dates of birth, medical record numbers, Social Security numbers, health insurance information, and some limited clinical data (collectively, "Private Information" or "PII and PHI").

2.      A hacker group known as Avoslocker has claimed credit for the cybersecurity attack, demanded a ransom, and posted a portion of it on the dark web.[1] Thus, Plaintiff's and Class Members' information is already being misused by cybercriminals.

3.      Defendant Christus Health is a non-profit health system, which operates a network of hospitals and medical centers, throughout Texas and in other states.[2]

4.      Defendant Christus Spohn is a non-profit health system, which operates a network of hospitals and medical centers, primarily in the Corpus Christi area of Texas and is owned and/or controlled by Defendant Christus Health as part of Defendant Christus Health's health system.[3]

5.      During the course of their business operations, Defendants acquired, collected, utilized, and derived a benefit from Plaintiff's and Class Members' Private Information. Therefore, Defendants owed and otherwise assumed statutory, regulatory, contractual, and common law duties and obligations, including to keep Plaintiff's and Class Members' PII confidential, safe, secure, and protected from the type of unauthorized access, disclosure, and theft that occurred in the Data Breach.

6.      Furthermore, Defendants through their privacy policy, both expressly and impliedly understood their obligations and promised to safeguard Plaintiff's and Class Members' Private Information. Plaintiff and Class Members relied on these express and implied promises when seeking out and paying for Defendants' services. But for this mutual understanding, Plaintiff and Class Members would not have provided Defendants with their Private Information.

---

[1] https://www.hipaajournal.com/avoslocker-claims-credit-for-christus-health-ransomware-attack/ (last visited December 6, 2022).
[2] https://www.christushealth.org/ (last visited December 21, 2022).
[3] https://www.christushealth.org/connect/ministries/spohn (last visited December 21, 2022).

Defendants, however, did not meet these reasonable expectations, causing Plaintiff and Class Members to suffer injury.

7.     On May 4, 2022, Defendants detected that they were the target of a cybersecurity attack from April 9, 2022 to May 4, 2022 (the "Data Breach").

8.     Defendants launched an investigation into the Data Breach and confirmed that an unauthorized actor accessed their system between April 9, 2022 to May 4, 2022 and copied and exfiltrated certain files containing Plaintiff's and Class Members' Private Information, including, but not limited to, the following: name, address, date of birth, medical record number, Social Security number, health insurance information, and some limited clinical data.[4]

9.     It was later discovered that a cybercriminal hacker group known as "Avoslocker" was responsible for the Data Breach and uploaded a sample of the stolen data on the Dark Web.[5]

10.     Despite learning of the Data Breach on May 4, 2022, Defendants did not begin sending notices of the Data Breach (the "Notice of Data Breach Letter") until July 1, 2022.[6]

11.     The Notice of Data Breach Letter sent to Plaintiff states the following:

> On May 4, 2022, the CHRISTUS information technology security team learned that an unauthorized third party gained access to our network and may have obtained certain files from CHRISTUS Spohn between April 9, 2022 – May 4, 022. We immediately began an investigation, and we recently completed a thorough review of the files and determined that some of your information may have been contained in the files, which may have included your name, address, date of birth, medical record number, Social Security number, and health insurance information. Some limited clinical data may have been included but it is important to note that your medical record was **not** accessed by the unauthorized party and your care will not be affected.

---

[4] https://www.christushealth.org/-/media/files/spohn/notice-to-our-patients-about-a-cybersecurity-incident.pdf (last visited December 6, 2022).
[5] https://www.hipaajournal.com/avoslocker-claims-credit-for-christus-health-ransomware-attack/ (last visited December 6, 2022).
[6] https://www.christushealth.org/-/media/files/spohn/notice-to-our-patients-about-a-cybersecurity-incident.pdf (last visited December 6, 2022).

We are notifying you of this event and offering to discuss any concerns you might have as a result. If you would like to discuss this item further, please feel free to reach out to us at this number set forth below. Further, as a precaution, we are offering you a complimentary one-year membership in Experian IdentityWorks Credit 3B. This product helps detect possible misuse of your personal information and provides you with identity protection services focused on immediate identification and resolution of identity theft. IdentityWorks is completely free to you and we understand that enrolling in this program will not hurt your credit score. **For more information on identity theft prevention and IdentityWorks, including instructions on how to activate your complimentary membership and information about identity protection, please see the additional information provided with this letter.**

12.     Based on the Notice of Data Breach Letter, Defendants admit that Plaintiff's and Class Members' Private Information was unlawfully accessed and exfiltrated.

13.     Moreover, Plaintiff's and Class Members' Private Information was then posted on the dark web, meaning their Private Information is exposed and has or likely will be used by cybercriminals for unlawful purposes.

14.     Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Defendants' inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access of an unknown third party and precisely what specific type of information was accessed.

15.     Defendants maintained the Private Information in a negligent manner. In particular, the Private Information was maintained on computer systems and networks that were in a condition vulnerable to cyberattack. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendants; and, thus, Defendants were on notice that failing to take appropriate protective measures would expose and increase the risk that the Private Information could be compromised and stolen.

4

16.    Hackers can offer for sale the unencrypted, unredacted Private Information to criminals. The exposed Private Information of Plaintiff and Class Members can, and likely will, be sold repeatedly on the dark web.

17.    Plaintiff and Class Members now face a current and ongoing risk of identity theft, which is heightened here by the loss of Social Security numbers – the gold standard for identity thieves.

18.    This Private Information was compromised due to Defendants' negligent and/or careless acts and omissions and the failure to protect the Private Information of Plaintiff and Class Members. In addition to Defendants' failure to prevent the Data Breach, after discovering the breach, Defendants waited several months to report it to government agencies and affected individuals.

19.    As a result of this delayed response, Plaintiff and Class Members had no idea their Private Information had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

20.    While many details of the Data Breach remain in the exclusive control of Defendants, upon information and belief, Defendants breached their respective duties and obligations by failing, in one or more of the following ways: (1) failing to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data retention policies; (3) failing to adequately train staff on data security; (4) failing to comply with industry-standard data security practices; (5) failing to warn Plaintiff and Class Members of Defendants' inadequate data security practices; (6) failing to encrypt or adequately encrypt the PII; (7) failing to recognize or detect that their network

had been compromised and accessed in a timely manner to mitigate the harm; (8) failing to utilize widely available software able to detect and prevent this type of attack, and (9) otherwise failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

21.    As a result of Defendants' unreasonable and inadequate data security practices that resulted in the Data Breach, Plaintiff and Class Members are at a current and ongoing risk of identity theft and have suffered numerous actual and concrete injuries and damages, including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their PII; (i) anxiety, annoyance and nuisance, and (j) the continued risk to their PII, which remains in the possession of Defendants, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

22.    Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose Private Information was accessed during the Data Breach. Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, future costs of identity theft monitoring, and injunctive relief including improvements to Defendants' data security systems, and future annual audits.

23.    Accordingly, Plaintiff brings this action against Defendants seeking redress for their unlawful conduct, and asserting claims for: (i) negligence, (ii) breach of implied contract,

(iii) negligence *per se*, (iv) breach of fiduciary duty; (v) public disclosure of private facts; (vi) unjust enrichment; and (vii) promissory estoppel.

## PARTIES

24.    Plaintiff Hesiquio Rodriguez is a Citizen of Texas residing in Corpus Christi, Texas. Plaintiff received a letter dated November 11, 2022, from Defendant Christus Spohn notifying Plaintiff that its network had been accessed and Plaintiff's Private Information may have been involved in the Data Breach.

25.    Defendant Christus Health is a non-profit corporation organized under the laws of Texas, and its United States headquarters and principal place of business is located at 919 Hidden Ridge, Irving, TX 75038 located in the Dallas Division of the Northern District of Texas. Service of process is proper on its registered agent Corporation Service Company d/b/a/ CSC-Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

26.    Defendant Christus Spohn Health System Corporation is a non-profit corporation organized under the laws of Texas, and its United States headquarters and principal place of business is located at 600 Elizabeth St., Corpus Christi, TX 78404-2235. Service of process is proper on its registered agent Corporation Service Company d/b/a/ CSC-Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

## JURISDICTION AND VENUE

27.    This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action involving more than 100 putative class members and the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Plaintiff (and many members of the class) and Defendant are citizens of different states.

28.     This Court has general personal jurisdiction over Defendants because Defendant Christus Health's principal place of business is, and regularly conducts business, in Irving, Texas.

29.     Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) as a substantial part of the events giving rise to the claims emanated from activities within this District, and Defendant Christus Health conducts substantial business in this District.

## FACTUAL ALLEGATIONS

### The Data Breach

30.     On May 4, 2022, Defendants discovered their network had been breached via cyberattack.

31.     Following a forensic investigation, Defendants then discovered that unknown cybercriminals had accessed, obtained, and exfiltrated the Private Information of approximately 771,727 individuals were affected.[7]

32.     Defendant Christus Spohn's Notice of Data Breach admits that Plaintiff's and Class Members' Private Information was accessed without authorization and "obtained" by cybercriminals.

33.     Defendant Christus Spohn further admits that cybercriminals not only viewed and accessed Plaintiff's and Class Members' Private Information, but also removed it from its network, meaning the Private Information was exfiltrated.

34.     Further, it was later discovered that, after removing Plaintiff's and Class Members' Private Information from Defendant Christus Spohn's network, cybercriminals posted the Private Information on the dark web.[8]

---

[7] https://oagtx.force.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited December 21, 2022).
[8] *See supra* Fn. 4.

*Defendants Jointly Operate with a Common Purpose*
*in Marketing, Billing, and Data Acquisition*

35.     Defendants hold themselves out to the public as a collective medical group and health care system with the same values, standards and quality of medical services. Indeed, the general consumer cannot tell the difference between the different entities.

36.     This collective public image and medical services connection is perpetuated and displayed though the uniform branding and logo utilized for both Defendants –i.e, the purple cross and prominently displaying the Christus Health name.

37.     As a condition of providing medical treatment and services, processing medical claims, sending bills, and providing collection services for treatment, Defendants require that their patients entrust them with Private Information.

38.     Plaintiff and Class Members relied on Defendants to keep their PII and PHI confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

39.     Defendants all operate, promote, and market themselves through the same interconnected website – https://www.christushealth.org. The website serves multiple functions but primarily serves as a marketing tool and operational tool that directs the visitors to one of their many network locations, including Defendant Christus Spohn, to schedule appointments. In order to schedule an appointment, a patient must submit personal information, address, health insurance, and type of physician, which is then stored on Defendants' data systems.

40.     In addition, the interconnected website serves as a payment portal and allows access to patient records through MyChart for patients in any MHS location. To access the bill payment or medical chart, the patients must also submit Social Security number and date of birth, which is also stored on Defendants' systems. In other words, Defendants, though the Christus Health

website, collectively operate to market, acquire patients, service patients, collect revenue, and even recruit new employees.

41.     Indeed, through the Christus Spohn website, and its scheduling, Mychart and billing platforms, the Defendants collect, share, analyze and store Plaintiff's and Class Members' Private Information, and each of them benefit from the acquisition and storage of the Private Information.

42.     By acquiring Private Information through intake forms and their joint website, Defendants all assumed, agreed to, and undertook legal duties to maintain the protected health and personal information entrusted to it by Plaintiffs and Class Members safely, confidentially, and in compliance with all applicable laws, including HIPAA.

43.     Upon information and belief, each Defendant had an equal right of control over the development and implementation of the joint marketing, and data acquisition and storage of Private Information.

***Defendants' Privacy Policy & Promises***

44.     Defendants made expressed and implied promises related to their duties and obligations to protect the data it acquired and stored on their system. These promises are incorporated into the Defendants' Notice of Privacy ("Privacy Policy").[9]

45.     Upon information and belief, Defendants collectively drafted, revised, approved and published the Privacy Policy with the intended purpose that it would apply to all Christus Health hospitals and medical facilities, including Defendant Christus Spohn's facilities.

46.     The Privacy Policy[10] provides in relevant part:

**Our Privacy Obligations**

We understand that your health information is personal and we are committed to protecting

---

[9] https://www.christushealthplan.org/privacy-statement (last visited December 5, 2022).
[10] https://www.christushealthplan.org/privacy-statement (last visited December 6, 2022).

your privacy. In addition, we are required by law to maintain the privacy of your health information, to provide you with this Notice of our legal duties and privacy practices with respect to your health information, and to notify you in the event of a breach of your unsecured health information. We may disclose your information electronically or in any other medium. However, whenever we use or disclose your health information, we are required to abide by the terms of the Notice that is in effect at the time of the use or disclosure.

**Uses and Disclosures of Your Health Information Without Your Written Authorization**

In certain situations (which are described in the next section below) we must obtain your written authorization in order to use and/or disclose your health information. However, we may use and disclose your health information without your written authorization for the following purposes:

A. For Treatment. . . .
B. For Payment. . . .
C. Health Care Operations. . . .
D. To a Business Associate. . . .
E. Family and Friends. . . .
F. We may also use and disclose your health information without your authorization for the following purposes:
   - As Required by Law
   - Public Health Activities
   - Health or Safety
   - Abuse, Neglect, or Domestic Violence reporting
   - Health Oversight Activities
   - Judicial and Administrative Proceedings
   - Law Enforcement Officials
   - National Security, Intelligence Activities, and Protective Services
   - Organ and Tissue Procurement
   - Coroners, Medical Examiners, and Funerals Directors
   - Workers' Compensation
   - Some Research studies
G. Marketing. . . .
H. Fundraising Communication. . . .

**Uses and Disclosures that Require Your Written Authorization**

For any purpose other than the ones described above, we only use or disclose your health information when you give us your written authorization. . . .

47.    Plaintiff and Class Members relied on Defendants' implied and expressed promises

11

to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

**Texas Breach Notice Statutes**

48.     The State of Texas also requires that any "person who conducts business in this state and owns or licenses computerized data that includes sensitive personal information shall disclose any breach of system security, after discovering or receiving notification of the breach, to any individual whose sensitive personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Tex. Bus. & Com. Code Ann. § 521.053(b). In fact, "breach of a security system" is defined as "[the] unauthorized acquisition of computerized data that compromises the security, confidentiality, or integrity of sensitive personal information." Tex. Bus. & Com. Code Ann. § 521.053(a).

49.     Because Defendants issued the data breach notification disclosure as required by Tex. Bus. & Com. Code. Ann. § 521.053, following the investigation, Defendants must have concluded that Plaintiff's and Class Members' "sensitive personal information was, or is reasonably believed to have been acquired by an unauthorized person." Tex. Bus. & Com. Code Ann. § 521.053. And this is consistent with the language in the notice letter that the data was not only accessed but also acquired –i.e., "copied" by the threat actors.

**Plaintiff Hesiquio Rodriguez's Experience**

50.     As a requisite to receiving medical services from Defendants, Plaintiff provided his Private Information to Defendants and trusted that the information would be safeguarded according to internal policies and state and federal law. Upon receipt, Private Information was entered and stored on Defendants' network and systems.

51.     Plaintiff is very careful about sharing his sensitive Private Information. Plaintiff has

never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

52.    Plaintiff stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for his various online accounts. Had he known Defendants failed to follow basic industry security standards and failed to implement systems to protect his Private Information, he would not have provided that information to Defendants.

53.    The Notice Letter dated November 11, 2022, from Defendant Christus Spohn notified Plaintiff that its network had been accessed and Plaintiff's Private Information may have been involved in the Data Breach, which included Plaintiff's name, address, date of birth, medical record number, and health insurance information.[11]

54.    Furthermore, Defendant directed Plaintiff to be vigilant and to take certain steps to protect his Private Information and otherwise mitigate his damages.[12]

55.    As a result of the Data Breach, Plaintiff heeded Defendants' warning and spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach, self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Defendants' direction by way of the Data Breach notice where Defendants advised Plaintiff to mitigate his damages by, among other things, monitoring his accounts for fraudulent activity.

56.    Even with the best response, the harm caused to Plaintiff cannot be undone.

---

[11] November 11, 2022 Letter from Christus Spohn Health System to Hesiquio Rodriguez, (attached as Exhibit 1).
[12] *Id.*

57.     Plaintiff further suffered actual injury in the form of damages to and diminution in the value of Plaintiff's Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

58.     He also lost his benefit of the bargain by paying for medical services that failed to provide the data security that was promised.

59.     Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

60.     Plaintiff has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties and possibly criminals.

61.     Future identity theft monitoring is reasonable and necessary and such services will include future costs and expenses.

62.     Plaintiff has a continuing interest in ensuring that Plaintiff's Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected, and safeguarded from future breaches.

***The Data Breach was Foreseeable***

63.     At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the PII and PHI of Plaintiff and Class Members and the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

64.     Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' network, amounting to potentially millions of

14

individuals' detailed, personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

65.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[13]

66.     Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the healthcare industry preceding the date of the breach.

67.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020. Of the 1,862 recorded data breaches, 330 of them, or 17.7% were in the medical or healthcare industry.[14] The 330 reported breaches in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.

68.     In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), Defendant knew or should have known that their electronic records would be targeted by cybercriminals.

---

[13] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last accessed Aug. 23, 2021).

[14] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (available at https://notified.idtheftcenter.org/s/), at 6.

69.    Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals… because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[15]

70.    In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[16]

71.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendants.

*Value of PII and PHI*

72.    The PII of consumers remains of high value to criminals, as evidenced by the prices offered through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[17] According to the Dark Web Price Index for 2021, payment card details for an account balance up to $1,000 have an average market value of $150, credit card details with an account balance up to $5,000 have an average market value of $240, stolen online banking logins with a minimum of $100 on the account have an average market value of $40, and stolen online banking logins with a minimum of $2,000 on the account have an

---

[15] FBI, Secret Service Warn of Targeted, Law360 (Nov.18,2019), https://www.law360.com/articles/1220974/fbisecret-service-warn-of-targeted-ransomware

[16] *See* Maria Hernandez, Iowa City Hospital Suffers Phishing Attack, Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

[17] *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends, Oct. 16, 2019, available at: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

average market value of $120.[18] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[19]

73.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.

74.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information…[is] worth more than 10x on the black market."[20]

75.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

76.     The fraudulent activity resulting from the Data Breach may not come to light for years.

77.     Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."

78.     There is also a robust legitimate market for the type of sensitive information at issue here. Marketing firms utilize personal information to target potential customers, and an entire

---

[18] *Dark Web Price Index 2021*, Zachary Ignoffo, March 8, 2021, available at: https://www.privacyaffairs.com/dark-web-price-index-2021/

[19] *In the Dark*, VPNOverview, 2019, available at: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

[20] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed Aug. 23, 2021).

economy exists related to the value of personal data.

79.    Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII and PHI on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

80.    Moreover, there may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[21]

81.    As such, future monitoring of financial and personal records is reasonable and necessary well beyond the one of protection offered by Defendant.

***Defendants Failed to Properly Protect Plaintiff's and Class Members' Private Information***

82.    Defendants could have prevented this Data Breach by properly securing and encrypting the systems containing the Private Information of Plaintiff and Class Members. Alternatively, Defendants could have destroyed the data, especially for individuals with whom it had not had a relationship for a period of time.

83.    Defendants' negligence in safeguarding the PII and PHI of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to companies like Defendants

---

[21] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last accessed Aug. 23, 2021).

18

to protect and secure sensitive data they possess.

84.    Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the PII and PHI of Plaintiff and Class Members from being compromised.

85.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[22]

86.    The ramifications of Defendants' failure to keep secure the PII and PHI of Plaintiff and Class Members are long lasting and severe. Once PII and PHI is stolen, fraudulent use of that information and damage to victims may continue for years.

87.    To prevent and detect unauthorized cyber-attacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter

---

[22] *See generally* https://www.ftc.gov/business-guidance/resources/fighting-identity-theft-red-flags-rule-how-guide-business (last accessed October 21, 2022).

executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[23]

88.     To prevent and detect cyber-attacks, including the cyber-attack that resulted in the

Data Breach, Defendants could and should have implemented, as recommended by the United

---

[23] *Id.* at 3-4.

States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[24]

89.    To prevent and detect cyber-attacks, including the cyber-attack that resulted in the

Data Breach, Defendants could and should have implemented, as recommended by the Microsoft

Threat Protection Intelligence Team, the following measures:

---

[24] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at* https://us-cert.cisa.gov/ncas/tips/ST19-001 (last accessed Aug. 23, 2021).

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[25]

90. Given that Defendants were storing the PII and PHI of Plaintiff and Class Members,

Defendants could and should have implemented all of the above measures to prevent and detect

---

[25] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last accessed Aug. 23, 2021).

cyberattacks.

91.    Moreover, given that Defendants were storing the PII and PHI of Plaintiff and Class Members on a separate server, Defendants could and should have implemented all of the above measures to prevent and detect cyberattacks.

92.    The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the PII and PHI of Plaintiff and Class Members.

93.    As a result of computer systems in need of security upgrades, inadequate procedures for handling email phishing attacks, viruses, malignant computer code, hacking attacks, Defendants negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information.

94.    Because Defendants failed to properly protect and safeguard Plaintiff's and Class Members' Private Information, an unauthorized third party was able to access Defendants' network, and access Defendants' database and system configuration files and exfiltrate that data.

***Defendants Failed to Comply with FTC Guidelines***

95.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making.

96.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks;

understand their network's vulnerabilities; and implement policies to correct any security problems.[26]

97.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

98.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

99.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions clarify the measures businesses take to meet their data security obligations.

100.     Defendants failed to properly implement basic data security practices.

101.      Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an

---

[26] Protecting Personal Information: A Guide for Business, Federal Trade Commission (2016). Available at https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business

unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

102. Defendants were always fully aware of their obligation to protect the Private Information of Plaintiff and Class Members. Defendants were also aware of the significant repercussions that would result from their failure to do so.

***Defendants Failed to Comply with Industry Standards***

103. As shown above, experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

104. Several best practices have been identified that at a minimum should be implemented by healthcare service providers like Defendants, including, but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

105. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

106. Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in

reasonable cybersecurity readiness.

107.    The foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendants failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

108.    Upon information and belief, Defendants failed to comply with one or more of the foregoing industry standards.

***Defendants' Conduct Violates HIPAA and Evidences Their Insufficient Data Security***

109.    HIPAA requires covered entities and business associates of covered entities like Defendants to protect against reasonably anticipated threats to the security of sensitive patient health information.

110.    Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

111.     Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Defendants left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D); and 45 C.F.R. § 164.530(b).

112.    A Data Breach such as the one Defendants experienced, is also considered a breach under the HIPAA Rules because there is an access of PHI that is not permitted under HIPAA.

113.    A breach under the HIPAA Rules is defined as, "the acquisition, access, use, or

disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." *See* 45 C.F.R. 164.40.

114.    Data breaches are also Security Incidents under HIPAA because they impair both the integrity (data is not interpretable) and availability (data is not accessible) of patient health information:

> The presence of ransomware (or any malware) on a covered entity's or business associate's computer systems is a security incident under the HIPAA Security Rule. A security incident is defined as the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system. See the definition of security incident at 45 C.F.R. 164.304. Once the ransomware is detected, the covered entity or business associate must initiate its security incident and response and reporting procedures. See 45 C.F.R.164.308(a)(6).[27]

115.    Defendants' Data Breach resulted from a combination of insufficiencies that demonstrates Defendant failed to comply with safeguards mandated by HIPAA regulations.

***Defendant Christus Health's Negligent Acts and Breaches***

116.    Defendant Christus Health participated and controlled the development, implementation and enforcement of the health network's privacy policy and controlled the process of gathering the Private Information from Plaintiff and Class Members.

117.    Defendant Christus Health therefore assumed and otherwise owed duties and obligations to Plaintiff and Class Members to take reasonable measures to protect the information, including the duty of oversight, training, instruction, testing of the data security policies and network systems. Defendant Christus Health breached these obligations to Plaintiff and Class Members and/or was otherwise negligent because it failed to properly implement data security systems and policies for their health providers network that would adequately safeguarded Plaintiff's and Class Members' Sensitive Information. Upon information and belief, Defendant

---

[27] *See* https://www.hhs.gov/sites/default/files/RansomwareFactSheet.pdf at 4.

Christus Health's unlawful conduct included, but is not limited to, one or more of the following

acts and/or omissions:

    a. Failing to design and maintain an adequate data security system to reduce the risk of data breaches and protect Plaintiff's and Class Members Sensitive Information;

    b. Failing to properly monitor its data security systems for data security vulnerabilities and risk;

    c. Failing to test and assess the adequacy of its data security systems;

    d. Failing to develop adequate training programs related to the proper handling of emails and email security practices;

    e. Failing to put into develop and place uniform procedures and data security protections for its healthcare network;

    f. Failing to adequately fund and allocate resources for the adequate design, operation, maintenance, and updating necessary to meet industry standards for data security protection;

    g. Failing to require a data security system to ensure the confidentiality and integrity of electronic PHI their network created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

    h. Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access to only those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

    i. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

    j. Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

    k. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

    l. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

    m. Failing to ensure that it was compliant with HIPAA security standard rules by their

workforces in violation of 45 C.F.R. § 164.306(a)(4);

n.   Failing to train all members of its workforce effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b);

o.   Failing to ensure that the electronic PHI it maintained is unusable, unreadable, or indecipherable to unauthorized individuals, as Defendants had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR 164.304 definition of encryption).

p.   Failing to ensure or otherwise require that it was compliant with FTC guidelines for cybersecurity;

q.   Failing to ensure or otherwise require that it was adhering to one or more of industry standards for cybersecurity discussed above;

r.   Failing to implement or update antivirus and malware protection software in need of security updating;

s.   Failing to require encryption or adequate encryption on their data systems;

t.   Otherwise negligently and unlawfully failing to safeguard Plaintiff's and Class Members' Private Information provided to Defendants, which in turn allowed cyberthieves to access its IT systems.

***Defendant Christus Spohn's Negligent Acts and Breaches***

118.   Defendant Christus Spohn breached its obligations to Plaintiff and Class Members and/or was otherwise negligent because it failed to properly maintain and safeguard their computer systems and data. Defendant Christus Spohn's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.   Failing to maintain an adequate data security system to reduce the risk of data breaches;

b.   Failing to adequately protect the Private Information of Plaintiff and the Class;

c.   Failing to properly monitor its own data security systems for existing intrusions;

d.  Failing to train employees in the proper handling of emails containing the means by which the cyberattacks were able to first access Defendants' networks, and to maintain adequate email security practices;

e.  Failing to put into place proper procedures, software settings, and data security software protections to adequately protect against a blunt force intrusion;

f.  Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

g.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access to only those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

h.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

i.  Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

j.  Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

k.  Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

l.  Failing to ensure compliance with HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

m.  Failing to train all members of their workforce effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b);

n.  Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR 164.304 definition of encryption).

o.  Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act; and

    p.    Failing to adhere to one or more of industry standards for cybersecurity discussed above;

    q.    Failing to implement or update antivirus and malware protection software in need of security updating,

    r.    Otherwise negligently and unlawfully failing to safeguard Plaintiff's and Class Members' Private Information provided to Defendants, which in turn allowed cyberthieves to access their IT systems.

<u>**COMMON INJURIES & DAMAGES**</u>

119.    As result of Defendants' ineffective and inadequate data security practices, Plaintiff and Class Members now face a present and ongoing risk of fraud and identity theft.

120.    Due to the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their Private Information; and (i) the continued risk to their Private Information, which remains in the possession of Defendants, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

***The Risk of Identity Theft to Plaintiff and Class Members is Present and Ongoing***

121.    The link between a data breach and the risk of identity theft is simple and well

established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

122.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity – or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

123.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

124.    The dark web is an unindexed layer of the internet that requires special software or authentication to access.[28] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[29] This prevents dark web

---

[28] *What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/
[29] *Id.*

marketplaces from being easily monitored by authorities or accessed by those not in the know.

125. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the PII and PHI at issue here.[30] The digital character of PII stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[31] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[32]

126. Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[33]

---

[30] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web
[31] *Id.; What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/
[32] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web
[33] Social Security Administration, *Identity Theft and Your Social Security Number*, available at:

What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

127.    Even then, new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[34]

128.    Social Security numbers, as one would expect, demand a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[35]

129.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity

---

https://www.ssa.gov/pubs/EN-05-10064.pdf.

[34] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Sep 13, 2022).

[35] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Sep 13, 2022).

thieves can use an individual's Social Security number to apply for additional credit lines.[36]

130.    Theft of PHI, in particular, is gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[37]

131.    One such example of criminals using PHI for profit is the development of "Fullz" packages.

132.    Cyber-criminals can cross-reference two sources of PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

133.    The development of "Fullz" packages means that stolen PHI from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and Class Members' stolen PHI is being misused, and that such misuse is fairly traceable to the Data

---

[36] *Identity Theft and Your Social Security Number*, Social Security Administration (2018) at 1. Available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Sep. 13, 2022).
[37] *See* Federal Trade Commission, Medical Identity Theft, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited Sep. 13, 2022).

Breach.

134.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[38]

135.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[39] Defendants did not rapidly report to Plaintiff and the Class that their Private Information had been stolen.

136.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

137.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by the theft of their PHI. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

138.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PHI. To protect themselves, Plaintiff and Class Members will need to be remain vigilant against unauthorized data use for years or even decades to come.

139.    The Federal Trade Commission ("FTC") has also recognized that consumer data is

---

[38] *See* https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last accessed October 21, 2022).
[39] *Id.*

36

a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[40]

140.    The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[41]

141.    According to the FTC, unauthorized PHI disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout. The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.[42]

142.    Defendants' failure to properly notify Plaintiff and Class Members of the Data

---

[40] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited May 28, 2015).
[41] *See generally* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.
[42] *See, e.g.*, https://www.ftc.gov/news-events/news/press-releases/2016/07/commission-finds-labmd-liable-unfair-data-security-practices (last accessed: October 21, 2022).

Breach exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PHI and take other necessary steps to mitigate the harm caused by the Data Breach.

### *Loss of Time to Mitigate the Risk of Identify Theft and Fraud*

143.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

144.    Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must, as Defendants' Notice instructs them, "review the statements you receive from your health care provider and health insurer" to mitigate the risk of identity theft.

145.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover and detect.

146.    Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the

damage to their good name and credit record."[43]

147.    Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[44]

148.    A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[45]

---

[43] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[44] *See* Federal Trade Commission, Identity Theft.gov, https://www.identitytheft.gov/Steps (last visited July 7, 2022).

[45] "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at: https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last visited Sep 13, 2022).



149.    In the event that Plaintiff and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[46] Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[47]

---

[46] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Sep. 13, 2022) ("GAO Report").
[47] *See* https://www.identitytheft.gov/Steps (last visited Sep. 13, 2022).

### *Diminution of Value of the Private Information*

150.    PII/PHI is a valuable property right.[48] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

151.    For example, drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII/PHI on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

152.    Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[49]

153.    Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, medical data was selling on the dark web for $50 and up.[50]

154.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[51] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data

---

[48] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[49] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Sep. 13, 2022).

[50] https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content (last visited Sep 13, 2022).

[51] https://www.latimes.com/business/story/2019-11-05/column-data-brokers

broker who in turn aggregates the information and provides it to marketers or app developers.[52, 53] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[54]

155.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its unauthorized release onto the Dark Web, where it is now available and holds significant value for the threat actors. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

### Future Cost of Credit and Identify Theft Monitoring Is Reasonable and Necessary

156.    To date, Defendants have done little to provide Plaintiff and Class Members with relief for the damages they have suffered as a result of the Data Breach -- Defendants have only offered 12 months of inadequate identity monitoring services, despite Plaintiff and Class Members being at risk of identity theft and fraud for the foreseeable future. Defendants have not offered any other relief or protection.

157.    The 12 months of credit monitoring offered to persons whose Private Information was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud. Defendants also place the burden squarely on Plaintiff and Class

---

[52] https://datacoup.com/
[53] https://digi.me/what-is-digime/
[54] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

Members by requiring them to expend time signing up for that service, as opposed to automatically enrolling all victims of this Data Breach.

158.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII, reports of misuse of Class Member PII discussed below, and reports of dissemination on the Dark Web also discussed below, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes – e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

159.    It must be noted there may be a substantial time lag – measured in years – between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

See GAO Report, at p. 29.

160.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

161.    Furthermore, the information accessed and disseminated in the Data Breach is

43

significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[55] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

162.     Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

163.     The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendants' Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendants' failure to safeguard their Private Information.

### *Loss of Benefit of the Bargain*

164.     Furthermore, Defendants' poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendants for their services, under certain terms, Plaintiff and other reasonable consumers understood and expected that they were, in part, paying, or being paid less, for services and data security to protect the Private Information, when in fact, Defendants did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

### *Injunctive Relief is Necessary to Protect Against Future Data Breaches*

165.     Moreover, Plaintiff and Class Members have an interest in ensuring that their

---

[55] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

Private Information, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

## CLASS ACTION ALLEGATIONS

166.    Plaintiff brings this action on behalf of herself and on behalf of all others similarly situated pursuant to TRCP 42.

167.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

All persons whose Private Information was actually or potentially accessed or acquired during the Data Breach for which Defendant Christus Spohn provided notice to Plaintiff and other Class Members beginning on or around July 1, 2022 (the "Class").

168.    Excluded from the Class are the following individuals and/or entities: Defendants' and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

169.    Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate. The proposed Class meets the criteria for certification under Rule 42(a), (b)(2), and (b)(3).

170.    <u>Numerosity.</u> Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are in excess of 770,000 individuals whose Private Information may have been improperly accessed in the Data Breach, and each Class is

apparently identifiable within Defendants' records.[56]

171.    <u>Commonality</u>. Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a.   Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiff and Class Members;

b.   Whether Defendants had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c.   Whether Defendants had duties not to use the Private Information of Plaintiff and Class Members for non-business purposes;

d.   Whether Defendants failed to adequately safeguard the Private Information of Plaintiff and Class Members;

e.   Whether and when Defendants actually learned of the Data Breach;

f.   Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

g.   Whether Defendants violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h.   Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.   Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.   Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

k.   Whether Defendants violated the consumer protection statutes invoked herein;

l.   Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

m. Whether Plaintiff and Class Members are entitled to restitution as a result of Defendants' wrongful conduct; and

---

[56] https://oagtx.force.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited December 21, 2022).

n. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

172.    Typicality. Plaintiff's claims are typical of those of other Class Members because all had their PII compromised as a result of the Data Breach, due to Defendants' misfeasance.

173.    Predominance. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

174.    Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

175.    Superiority. Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum

simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

176.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

177.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, including their privacy policy, uniform methods of data collection, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

178.    Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

179.    Unless a Class-wide injunction is issued, Defendants may continue in their failure to properly secure the Private Information of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

180.    Further, Defendants have acted or refused to act on grounds generally applicable to the Classes and, accordingly, class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

181.    Likewise, particular issues under Rule 42(d)(1) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.  Whether Defendants owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

b.  Whether Defendants breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c.  Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d.  Whether an implied contract existed between Defendants on the one hand, and Plaintiff and Class Members on the other, and the terms of that implied contract;

e.  Whether Defendants breached the implied contract;

f.  Whether Defendants adequately and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

g.  Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.  Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members; and

49

i.    Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendants' wrongful conduct.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

182.    Plaintiff and the Class repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

183.    Defendants required Plaintiff and Class Members to submit non-public personal information in order to obtain healthcare services.

184.    Defendants owed a duty of care to secure and safeguard the computer systems holding Plaintiff's and Class Members' Private Information that Defendants acquired.

185.    The duty included obligations to take reasonable steps to prevent disclosure of the Private Information, and to safeguard the information from theft. Defendants' duties included the responsibility to design, implement, and monitor data security systems, policies, and processes to protect against reasonably foreseeable data breaches such as this Data Breach.

186.    Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, policies, and procedures, and the personnel responsible for them, adequately protected the Private Information.

187.    Defendants owed a duty of care to safeguard the Private Information due to the foreseeable risk of a data breach and the severe consequences that would result from their failure to so safeguard the Private Information.

188.    Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and their patients, which is recognized by

50

laws and regulations including but not limited to HIPAA, the FTC Act, Tex. Bus. & Com. Code Ann. § 521.052, as well as common law. Defendants were in a position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

189.    Defendants' duty to use reasonable security measures under HIPAA required Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).  Some or all of the healthcare, dental, and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

190.    In addition, Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

191.    Defendants also had a duty under Tex. Bus. & Com. Code Ann. § 521.052(a) "to implement and maintain reasonable procedures, including taking any appropriate corrective action, to protect from unlawful use or disclosure any sensitive personal information collected or maintained by [Defendant] in the regular course of business."

192.    Defendants also had a duty under Tex. Bus. & Com. Code Ann. § 521.052(b) to destroy any Private Information that was no longer necessary for it to maintain.

193.    Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information that it either acquires, maintains, or stores.

194.    Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information, as alleged and discussed above.

195.    It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' Private Information would result in injury to Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

196.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

197.    The imposition of a duty of care on Defendants to safeguard the Private Information they maintained is appropriate because any social utility of Defendants' conduct is outweighed by the injuries suffered by Plaintiff and Class Members as a result of the Data Breach.

198.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members are at a current and ongoing risk of identity theft, and Plaintiff and Class Members sustained compensatory damages including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) diminution of value of their PII; (h) future costs of identity theft monitoring; (i) anxiety, annoyance and nuisance, and (j) the continued risk to their PII, which remains in the possession of Defendants, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

199.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

200.    Defendants' negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and unsecure manner.

201.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

### COUNT II
### BREACH OF IMPLIED CONTRACT
#### (On Behalf of Plaintiff and All Class Members)

202.    Plaintiff and the Class repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

203.    Plaintiff and the Class entrusted their Private Information to Defendants. In so doing, Plaintiff and the Class entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

204.    In their Privacy Policy, Defendants represented that they would not disclose Plaintiff's and Class Members' Private Information to unauthorized third-parties.

205.    Plaintiff and the Class fully performed their obligations under the implied contracts with Defendants.

206.    When Plaintiff and Class Members provided their Private Information to Defendants in exchange for Defendants' services, they entered into implied contracts with

Defendants pursuant to which Defendants agreed to reasonably protect such information and to destroy any Private Information that it was no longer required to maintain.

207.    The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendants on the other, is demonstrated by their conduct and course of dealing.

208.    Defendants solicited, offered, and invited Plaintiff and Class Members to provide their Private Information as part of Defendants' regular business practices.

209.    Plaintiff and Class Members accepted Defendants' offers and provided their Private Information to Defendants.

210.    In accepting the Private Information of Plaintiff and Class Members, Defendants understood and agreed that they were required to reasonably safeguard the Private Information from unauthorized access or disclosure.

211.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations, including HIPAA, the FTC Act, Texas statutes, and were consistent with industry standards.

212.    Plaintiff and Class Members paid money to Defendants or provided labor to Defendants with the reasonable belief and expectation that Defendants would use part of their earnings to obtain adequate data security. Defendants failed to do so.

213.    Plaintiff and Class Members would not have entrusted their Private Information to Defendants in the absence of the implied contract between them and Defendants to keep their information reasonably secure.

214.    Plaintiff and Class Members would not have entrusted their Private Information to Defendants in the absence of their implied promise to monitor their computer systems and

networks to ensure that it adopted reasonable data security measures.

215.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendants.

216.    Defendants breached their implied contracts with Plaintiff and Class Members by failing to safeguard and protect their Private Information or to destroy it once it was no longer necessary to retain the Private Information.

217.    As a direct and proximate result of Defendants' breach of the implied promises, Plaintiff and Class Members are at a current and ongoing risk of identity theft, and Plaintiff and Class Members sustained incidental and consequential damages including: (a) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) financial "out of pocket" costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (e) loss of time due to increased spam and targeted marketing emails; (f) diminution of value of their PII; (g) future costs of identity theft monitoring; (h) and the continued risk to their PII, which remains in the possession of Defendants, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

218.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

219.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## COUNT III
## NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and All Class Members)

220.    Plaintiff and the Class repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

221.    Pursuant to Federal Trade Commission, 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

222.    Pursuant to HIPAA, 42 U.S.C. § 1302d, et seq., Defendants had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

223.    Pursuant to HIPAA, Defendants had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* definition of encryption at 45 C.F.R. § 164.304.

224.    Defendants also had a duty under Tex. Bus. & Com. Code Ann. § 521.052(a) "to implement and maintain reasonable procedures, including taking any appropriate corrective action, to protect from unlawful use or disclosure any sensitive personal information collected or maintained by [Defendants] in the regular course of business."

225.    Defendants also had a duty under Tex. Bus. & Com. Code Ann. § 521.052(b) to destroy any Private Information that was no longer necessary for it to maintain.

226.    Defendants breached their duties to Plaintiff and Class Members under the FTC Act, HIPAA, and Tex. Bus. & Com. Code Ann. § 521.052, *et seq.* by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and

Class Members' Private Information.

227. Defendants' failure to comply with applicable laws and regulations constitutes negligence per se.

228. But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

229. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendants' breach of its duties. Defendants knew or should have known that they were failing to meet their duties, and that Defendants' breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

230. As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members are at a current and ongoing risk of identity theft, and Plaintiff and Class Members sustained compensatory damages including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) diminution of value of their PII; (h) future costs of identity theft monitoring; (i) anxiety, annoyance and nuisance, and (j) the continued risk to their PII, which remains in the possession of Defendants, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

231. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

232.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## COUNT IV
## BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiff and All Class Members)

233.    Plaintiff and the Class repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

234.    In light of the special relationship between Defendants and Plaintiff and Class Members, whereby Defendants became guardians of Plaintiff's and Class Members' Private Information, Defendants became a fiduciary by their undertaking and guardianship of the Private Information, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and do store.

235.    Defendants have a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendants' relationship with their patients, in particular, to keep secure their Private Information.

236.    Defendants breached their fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

237.    Defendants breached their fiduciary duties to Plaintiff and Class Members by failing to encrypt or otherwise protect the integrity of the systems containing Plaintiff's and Class

Members' Private Information.

238.    Defendants breached their fiduciary duties owed to Plaintiff and Class Members by failing to timely notify and/or warn Plaintiff and Class Members of the Data Breach.

239.    Defendants breached their fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

240.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members sustained compensatory damages including (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) diminution of value of their PII; (h) future costs of identity theft monitoring; (i) anxiety, annoyance and nuisance, and (j) the continued risk to their PII, which remains in the possession of Defendants, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

241.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

242.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## COUNT V
## PUBLIC DISCLOSURE OF PRIVATE FACTS

**(On Behalf of Plaintiff and All Class Members)**

243.    Plaintiff and the Class repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

244.    Plaintiff and Class Members had a reasonable expectation of privacy in the Private Information Defendants mishandled.

245.    As a result of Defendants' conduct, publicity was given to Plaintiff's and Class Members' Private Information, which necessarily includes matters concerning their private life such as PII and PHI.

246.    A reasonable person of ordinary sensibilities would consider the publication of Plaintiff's and Class Members' Private Information to be highly offensive.

247.    Plaintiff's and Class Members' Private Information is not of legitimate public concern and should remain private.

248.    As a direct and proximate result of Defendants' public disclosure of private facts, Plaintiff and Class Members are at a current and ongoing risk of identity theft and sustained compensatory damages including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) diminution of value of their PII; (h) future costs of identity theft monitoring; (i) anxiety, annoyance and nuisance, and (j) the continued risk to their PII, which remains in the possession of Defendants, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

249.     Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

250.     Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT VI**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and All Class Members)**

251.     Plaintiff and the Class repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

252.     Plaintiff and Class Members conferred a monetary benefit on Defendants, by providing Defendants with their valuable Private Information. Indeed, in acquiring the Private Information, Defendants were then able to charge money for their medical services.

253.     Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information, which cost savings increased the profitability of the services.

254.     Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

255.     Under the principles of equity and good conscience, Defendants should not be permitted to retain the monetary value of the benefit belonging to Plaintiff and Class Members,

because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

256.    Defendants acquired the monetary benefit, PII, and PHI through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

257.    Had Plaintiff and Class Members known that Defendants had not secured their PII and PHI, they would not have agreed to provide their PII and PHI to Defendants. Plaintiff and Class Members have no adequate remedy at law.

258.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

259.    Furthermore, as a direct and proximate result of Defendants' unreasonable and inadequate data security practices, Plaintiff and Class Members are at a current and ongoing risk of identity theft and have sustained incidental and consequential damages, including: (a) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) financial "out of pocket" costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (e) loss of time due to increased spam and targeted marketing emails; (f) the loss of benefit of the bargain (price premium damages); (g) diminution of value of their PII; (h) future costs of identity theft monitoring; and (i) the continued risk to their PII, which remains in the possession of Defendants, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

260.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

261.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

262.    Moreover, Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendants' services.

### COUNT VII
### PROMISSORY ESTOPPEL
### (On Behalf of Plaintiff and All Class Members)

263.    Plaintiff and the Class repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

264.    Defendants promised through their Privacy Policy to protect Plaintiff's and Class Members' Private Information.

265.    It was foreseeable that Plaintiff and Class Members would reasonably rely on this promise because Defendants are reputed and established medical services providers with multiple locations.

266.    Plaintiff and Class Members, to their substantial detriment, did in fact rely on Defendants' promises as contained in their Privacy Policy.

267.    Furthermore, if Defendants had made it known to Plaintiff and Class Members that they would not have safeguarded Plaintiff's and Class Members' Private Information, Plaintiff and Class Members would not have agreed to receive medical services from Defendants.

268.    As a direct and proximate result of Defendants' breach of their promises, Plaintiff

and Class Members are at current and ongoing risk of identity theft and have suffered incidental and consequential damages including: (a) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) financial "out of pocket" costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (e) loss of time due to increased spam and targeted marketing emails; (f) the loss of benefit of the bargain (price premium damages); (g) diminution of value of their PII; (h) future costs of identity theft protection, and (i) the continued risk to their PII, which remains in the possession of Defendants, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

269. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

270. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, requests judgment against Defendants and that the Court grant the following:

A. For an Order certifying the Class, and appointing Plaintiff and his Counsel to represent the Class;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct

complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

   i.    prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

   ii.   requiring Defendants to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

   iii.  requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

   iv.   requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

   v.    prohibiting Defendants from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

   vi.   requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on

Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vii.   requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.   requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

ix.   requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

x.   requiring Defendants to conduct regular database scanning and securing checks;

xi.   requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii.   requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.   requiring Defendants to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding

66

subparagraphs, as well as randomly and periodically testing employees compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xiv. requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi. requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including, but not limited to, actual, consequential, and nominal damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G.     Such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands that this matter be tried before a jury.


Date: December 23, 2022                    Respectfully Submitted,


/s/ *Joe Kendall*
JOE KENDALL
Texas Bar No. 11206700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Ste. 1450
Dallas, Texas 75219
Phone: 214-744-3000
Fax: 214-744-3015
Email: *jkendall@kendalllawgroup.com*

Joseph M. Lyon*
**THE LYON FIRM, LLC**
2754 Erie Ave.
Cincinnati, OH 45208
Phone: (513) 381-2333
Fax: (513) 766-9011
Email: *jlyon@thelyonfirm.com*

Bryan L. Bleichner*
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue South, Suite 1700
Minneapolis, MN 55401
Phone: (612) 339-7300
Fax: (612) 336-2940
Email: *bbleichner@chestnutcambronne.com*

*\*Pro Hac Vice Application forthcoming*

***Counsel for Plaintiff and Putative Class***